UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

**2018 SEP 20  AM 8: 30**

CLERK

BY_____
DEPUTY CLERK

COMCAST OF CONNECTICUT/ )
GEORGIA/MASSACHUSETTS/NEW )
HAMPSHIRE/NEW YORK/NORTH )
CAROLINA/VIRGINIA/VERMONT, LLC )
d/b/a COMCAST, )
)
    Plaintiff, )
)
v. )    Case No. 5:17-cv-161
)
THE VERMONT PUBLIC UTILITY )
COMMISSION, and SARAH HOFMANN )
and JAMES VOLZ, in their official )
capacities as members of THE VERMONT )
PUBLIC UTILITY COMMISSION, )
)
    Defendants, )
)
and )
)
VERMONT ACCESS NETWORK, INC., )
)
    Intervenor. )

## ORDER ON MOTIONS FOR PARTIAL DISMISSAL
### (Docs. 22, 32)

Plaintiff Comcast of Connecticut/Georgia/Massachusetts/New Hampshire/New

York/North Carolina/Virginia/Vermont, LLC d/b/a Comcast ("Comcast") has filed this action

seeking judicial review of recent orders of the Vermont Public Utility Commission ("VPUC")

(previously called the Vermont Public Service Board ("PSB"))[1] in Docket No. 8301.  These

orders concern renewal of the Certificate of Public Good ("CPG") authorizing Comcast to

_____

[1] Effective July 1, 2017, the Public Service Board's name was changed to the Vermont
Public Utility Commission.  *See* 30 V.S.A. § 3.  For simplicity, the court refers to the regulator as
the VPUC throughout.  References to the "Board" or the "PSB" below accordingly mean the
entity that is now the VPUC.

operate within Vermont. (Doc. 29.) The orders at issue include the 102-page Order entered on January 13, 2017 (the "Renewal Order") (Doc. 29-2), the accompanying Renewed and Consolidated Certificate of Public Good entered on the same date (the "Renewal CPG") (Doc. 29-1), and the Order denying a motion to alter or amend judgment entered on July 27, 2017 (Doc. 29-4). Comcast asserts that the Renewal CPG is unlawful because it imposes arbitrary conditions on Comcast's Vermont cable operations, including a requirement that Comcast make costly engineering changes to accommodate what it describes as unreasonable demands from local public, educational, and governmental ("PEG") access channels. (Doc. 29 ¶¶ 3–4.) One of Comcast's particular objections is to requirements in the Renewal CPG that it extend its service to areas in Vermont which are currently without cable access. (*See id.* ¶ 4.)

Previously in this case the court granted a motion to intervene filed by the Vermont Access Network, Inc. (VAN), which is a non-profit umbrella organization composed of Vermont Access Management Organizations (AMOs) that operate PEG channels. (Doc. 37.) Defendants filed a motion for partial dismissal under Fed. R. Civ. P. 12(b)(1) and 12(b)(6) on December 18, 2017. (Doc. 22.) After Comcast filed an Amended Complaint (Doc. 29), Defendants filed a second motion for partial dismissal directed at that pleading. (Doc. 32.) Comcast has filed a single opposition to both motions. (Doc. 38.) Defendants have filed a reply (Doc. 43) and Comcast has filed a sur-reply (Doc. 48). The court held a hearing on both motions to dismiss on April 16, 2018 (*see* Doc. 55 (transcript)), at which time the motions were taken under advisement.

## Background

The court begins by describing the combination of federal and state law that applies to Comcast's claims.  The court then summarizes the allegations in Comcast's Amended Complaint.

## I.      Statutory Framework

The regulation of the cable industry has long taken place through a process of cooperative federalism in which Congress delegates authority to state and local bodies to develop the rules and conditions under which cable operators are authorized to provide service to customers.  The Cable Communications Policy Act of 1984, 47 U.S.C. §§ 521–573 (the "Cable Act"), governs this relationship between national telecommunications policy and its implementation within individual states.  Section 521 states the purposes of the Cable Act which include establishing a national policy concerning cable communications as well as guidelines for the exercise of state and local authority, assuring the widest possible diversity of information sources and services to the public, and establishing an "orderly process for franchise renewal which protects cable operators against unfair denials of renewal."

The Cable Act expressly authorizes a state or local franchising authority such as the VPUC to require a cable operator to set aside PEG channels.  47 U.S.C. § 531; *see Goldberg v. Cablevision Sys. Corp.*, 261 F.3d 318, 320 (2d Cir. 2001) (alterations in original) (quoting *Denver Area Educ. Telecomm.s Consortium, Inc. v. FCC*, 518 U.S. 727, 734 (1996) (plurality opinion of Breyer, J.) ("The Cable Act seeks to promote this type of arrangement within a nationally uniform structure that by providing that a 'franchising authority,' typically a local government or municipality, may require a cable operator to make channel capacity available for 'PEG access programming' as part of the franchise agreement pursuant to which the cable

operator provides services to a community."). Similarly, the Cable Act authorizes a franchising authority to include proposals for an upgrade of the cable system within a proposal for renewal. 47 U.S.C. § 546. Disputes arising from the final determinations of a franchise authority are subject to judicial review. Consistent with the spirit of cooperative federalism which is a defining feature of the Cable Act, an action seeking judicial review may be filed in state or federal court. 47 U.S.C. §§ 546(e), 555(a).[2]

Cable regulation in Vermont occurs through the VPUC. Vermont law confers authority on the VPUC to grant, deny, and renew certificates of public good (CPGs) for cable television operators in the State of Vermont. (Doc. 29 ¶ 7.)[3] A CPG is a "franchise" as that term is defined in the Cable Act. (Doc. 29 ¶ 7.)[4] The VPUC is therefore the cable "franchising authority" in Vermont as that term is defined in 47 U.S.C. § 522(10). (Doc. 29 ¶ 7.)[5]

---

[2] The Cable Act is one of several federal statutes which delegate regulatory authority to state agencies. *See Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 289 (1981) (Surface Mining Act is a "cooperative federalism" statute "that allows the States, within limits established by federal minimum standards, to enact and administer their own regulatory programs, structured to meet their own particular needs."); *Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA*, 846 F.3d 492, 502 (2d Cir. 2017) (Clean Water Act envisions "'cooperative federalism' in the management of the nation's water resources"); *see generally* Sarah C. Rispin, *Cooperative Federalism & Constructive Waiver of State Sovereign Immunity*, 70 U. Chi. L. Rev. 1639, 1640 (2003) (discussing sovereign immunity doctrine as a hurdle to private litigation under cooperative federalism statutes).

[3] *See* 30 V.S.A. § 502(b) ("The [VPUC] shall be the franchising authority in the State empowered to grant, renew, and revoke certificates of public good for all cable television systems and shall have all other authority to regulate cable television systems.").

[4] Section 522(9) of Title 47 defines a "franchise" as "an initial authorization, or renewal thereof (including a renewal of an authorization which has been granted subject to section 546 of this title), issued by a franchising authority, whether such authorization is designated as a franchise, permit, license, resolution, contract, certificate, agreement, or otherwise, which authorizes the construction or operation of a cable system."

[5] Section 522(10) defines a "franchising authority" to mean "any governmental entity empowered by Federal, State, or local law to grant a franchise."

## II.      The VPUC's January 13, 2017 Renewal Order

Comcast is a cable operator authorized to provide cable television service over cable systems in many locations across Vermont. (Doc. 29 ¶ 6.)  Comcast's CPG authorizes the company to provide cable service to 197 cities, towns, and gores, and currently services over 110,000 customers in Vermont. (*Id.*)  Comcast competes with direct broadcast satellite distributors such as DirecTV and DISH, with telephone companies like FairPoint/Consolidated, and with other cable operators such as Burlington Telecom and VTel. (*Id.* ¶ 13.)  Comcast has operated cable television systems in Vermont under two CPGs awarded by the VPUC. (*Id.* ¶ 14.)  The earlier of the two relevant CPGs (in VPUC Docket No. 7077) was issued in 2005 in conjunction with Comcast's acquisition of cable systems formerly operated by Adelphia Communications Corporation and its Vermont affiliates. (*Id.* ¶ 39.)

The CPG that was issued in 2005 had an expiration date of December 29, 2016.  The VPUC and Comcast agreed to consolidate the renewal of that CPG with renewal of the second CPG (in VPUC Docket No. 7379). (*See id.* ¶ 14.)[6]  Comcast participated in the renewal proceedings along with VAN and the Vermont Department of Public Service, which serves as the public advocate for Vermont cable subscribers.

The VPUC issued the Renewal Order on January 13, 2017 in Docket 8301.  It consolidated the Docket 7379 CPG into the Docket 7077 CPG for the purposes of a single renewal proceeding. (Doc. 29-2 at 19.)[7]  In the Renewal Order, the VPUC concluded that "the issuance to Comcast of a renewed and consolidated CPG, subject to the terms and conditions

---

[6] A copy of the Docket 7077 CPG is attached to the Amended Complaint at Doc. 29-3.

[7] VPUC Member Margaret Cheney recused herself from participation in the proceeding, and the Renewal Order was decided by the remaining VPUC members: Chair James Volz and Board Member Sarah Hofmann. (*See* Doc. 29-2 at 2 & n.1.)  Mr. Volz and Ms. Hofmann are accordingly the named individual Defendants in this case.

adopted by the Board in this Order, for the ownership and operation of a cable television system in the State of Vermont will promote the general good of the state." (*Id.* at 102.) The VPUC accordingly issued the Renewal CPG. (Doc. 29-1.) The VPUC denied Comcast's motion to alter or amend the judgment in an Order dated July 27, 2017. (Doc. 29-4.)

The Renewal Order did not adopt a "Renewal Proposal" for which Comcast had advocated in the course of the renewal proceedings. (*See* Doc. 29 ¶ 54.) Instead, the Renewal Order imposed a variety of new conditions, several of which Comcast contests in this lawsuit. (*See id.*)

## III.    Contested Conditions in the Renewal Order

The conditions in the Renewal Order that Comcast challenges are: (1) a condition relating to an interactive program guide (Condition 22(3)); (2) conditions relating to cable television line extensions (Conditions 13(7), 33, and 34); (3) additional cable and network construction requirements; (4) remote origination site construction (Conditions 21(b) and (c)); (5) simultaneous live PEG programming/in-house switching ability (Conditions 24 and 30); and (6) I-Net obligations and service contract limitations (Conditions 50 to 55). (Doc. 29 ¶¶ 60–119.)

For present purposes, it is unnecessary to describe each of these contested conditions in detail.[8] Generally, Comcast alleges that the contested conditions "will add millions of dollars in additional costs and fees on Comcast's cable operations that Vermont cable subscribers have made clear they do not want to pay." (*Id.* ¶ 57.) Comcast maintains that the contested conditions "will also impede Comcast's ability to compete for cable subscribers in the State and likely result

---

[8] More details regarding the conditions relating to cable television line extensions are necessary to understand the VPUC's motion to dismiss Comcast's First Amendment claim. Those additional details are set forth below.

6

in the loss of existing subscribers." (*Id.*)  According to Comcast, "[t]he VPUC's denial of Comcast's Renewal Proposal and adoption of the Renewal CPG contravene the statutory procedures and grounds for denial of a cable franchise under federal and Vermont law." (*Id.* ¶ 58.)  Comcast says that "[t]he VPUC's actions and orders are also contradicted or otherwise unsupported by the record evidence." (*Id.*)

## IV.   Comcast's Legal Claims and Requested Relief

Comcast asserts nine counts in its Amended Complaint.  The pending motions do not seek dismissal of the following four counts: (1) violation of the procedural requirements of 47 U.S.C. § 546 (Count 1); (2) violation of the substantive requirements of 47 U.S.C. §§ 541 and 546 (Count 2); (3) violation of 47 U.S.C. §§ 542 and 543 (Count 3); and (4) violation of procedural due process (Count 7).  Defendants' motions are directed only at Counts 4–6 and 8–9, so the court focuses its summary here on a description of those five counts.

In Counts 4–6 of its original complaint, Comcast alleged that the VPUC violated the following provisions of Vermont law: 30 V.S.A. §§ 504 and 506 (Count 4); 30 V.S.A. § 517 and 18-1 Vt. Code R. § 29:8.313 (Count 5); 30 V.S.A. § 509 (Count 6).  (Doc. 1 ¶¶ 147–160.)  In their original motion for partial dismissal, Defendants argued that all of Comcast's state-law claims should be dismissed for lack of subject matter jurisdiction under the Eleventh Amendment.  (Doc. 22 at 5.)  In its Amended Complaint, Comcast amended Counts 4–6 to allege that the "application" of each of the enumerated Vermont laws is preempted by 47 U.S.C. § 556(c) and the Supremacy Clause.  (Doc. 29 ¶¶ 147–163.)

In Count 8, Comcast alleges that it is a cable operator and a member of the press with rights and protections under the First Amendment of the U.S. Constitution and Article 13 of the Vermont Constitution.  (Doc. 29 ¶ 174.)  According to Comcast, "laws and regulations that

single out members of the press are subject to heightened scrutiny under the First Amendment."
(*Id.*)  Comcast maintains that the 550-mile line extension requirement in Condition 33 is "a unique and discriminatory requirement imposed by the VPUC on Comcast that constitutes a speaker-based burden on Comcast's speech rights."  (*Id.* ¶ 175.)  Comcast asserts that the VPUC "has failed to justify Condition 33 as necessary to serve a compelling state interest" or as "narrowly tailored to achieve a compelling state interest."  (*Id.* ¶ 177.)  In Count 9, Comcast asserts that "[t]he disparate treatment of Comcast and its subscribers under Condition 33 violates the Common Benefits Clause [of Article 7 of the Vermont Constitution], which applies to administrative or quasi-judicial determinations as well as legislative enactments."  (Doc. 29 ¶ 183.)

For relief, Comcast requests a "declaration that the VPUC's actions and orders denying Comcast's Renewal Proposal and imposing a different CPG with the contested conditions were procedurally and substantively unlawful, will impede Comcast's ability to offer competitive cable services in the State to retain and attract subscribers, and will be harmful to Vermont consumers."  (*Id.* ¶ 5.)  Comcast seeks an order enjoining the VPUC from enforcing the allegedly unlawful conditions.  (*Id.*)

## Analysis

### I.     Legal Standards

Invoking the doctrine of sovereign immunity, Defendants seek dismissal of Counts 4–6 and portions of Counts 8–9 under Fed. R. Civ. P. 12(b)(1).  Defendants also seek dismissal of Comcast's First Amendment violation claim (Count 8) and Counts 4–6 under Fed. R. Civ. P. 12(b)(6).  The court accordingly reviews the Rule 12(b)(1) and 12(b)(6) standards here.

## A.      Rule 12(b)(1)

"A district court properly dismisses an action under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction if the court 'lacks the statutory or constitutional power to adjudicate it . . . .'" *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.À.R.L.*, 790 F.3d 411, 417 (2d Cir. 2015) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)).  Where, as here, a Rule 12(b)(1) motion is "facial"—i.e., "based solely on the allegations of the complaint or the complaint and exhibits attached to it"—the plaintiff has no evidentiary burden in opposing the motion.  *Carter v. HealthPort Technologies, LLC*, 822 F.3d 47, 56 (2d Cir. 2016).  The court's task is to determine whether the pleadings allege "facts that affirmatively and plausibly suggest that [the plaintiff] has standing to sue." *Id.* (alteration in original) (quoting *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011) (per curiam)).  In ruling on a facial Rule 12(b)(1) motion, the court must accept as true all material allegations of the complaint, and must construe the complaint in favor of the plaintiff. *See id.*

## B.      Rule 12(b)(6)

To survive a Rule 12(b)(6) motion, a pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also* Fed. R. Civ. P. 8(a)(2).  The court must also draw all reasonable inferences in the non-moving party's favor.  *Lanier v. Bats Exch., Inc.*, 838 F.3d 139, 150 (2d Cir. 2016).  Dismissal is appropriate when "it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law." *Conopco, Inc. v. Roll Int'l*, 231 F.3d 82, 86 (2d Cir. 2000).

## II.    Jurisdiction Over State-Law Claims; State Sovereign Immunity

In its Amended Complaint, Comcast asserts that the court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 2201 and 47 U.S.C. §§ 546(e)(1) and 555(a)(1).  Comcast also asserts that, under 28 U.S.C. § 1367(a), the court has supplemental jurisdiction over Comcast's state-law claims "because they are interrelated to the claims within the Court's original jurisdiction."  (Doc. 29 ¶ 10.)  But the supplemental jurisdiction statute does not extend jurisdiction "to claims against nonconsenting state defendants," *Raygor v. Regents of Univ. of Minn.*, 534 U.S. 533, 542 (2002), i.e., it does not override a state's sovereign immunity.  On that basis, Defendants maintain that "Eleventh Amendment" sovereign immunity bars Comcast's state-law claims.  (Doc. 32 at 5.)

The immunity that Defendants invoke is the states' broad sovereign immunity that applies against all private suits, whether in state or federal court. *See Beaulieu v. Vermont*, 807 F.3d 478, 483 (2d Cir. 2015) (describing the different versions of immunity).  This type of immunity is sometimes called "Eleventh Amendment immunity" but it does not actually derive from the Eleventh Amendment; rather, it is a "fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today." *Alden v. Maine*, 527 U.S. 706, 713 (1999).  The other type of immunity—"immunity of a state's treasury from claims for damages brought by private entities in federal courts"—is not at issue in this case because Comcast does not seek damages. *Beaulieu*, 807 F.3d at 483 (citing *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996)).

Comcast replies that the court has statutory and constitutional power to review and grant relief on each of the state-law counts.  (Doc. 38 at 10.)

The court begins by discussing a prior case litigated in this district: *Mountain Cable v. Vermont Public Service Board*, No. 1:00-cv-00298-jgm. *Mountain Cable* is similar to this case in many respects, offers answers to some questions raised here, and provides a starting point for analysis.

A.  ***Mountain Cable***

In *Mountain Cable*, as here, a cable operator—Mountain Cable Company, d/b/a Adelphia Cable Communications ("Adelphia")—sought review of the PSB's denial of certain aspects of a cable franchise renewal.[9]  Adelphia asserted claims under both federal law and Vermont state law.  Complaint, *Mountain Cable*, No. 1:00-cv-00298-jgm (D. Vt. Aug. 18, 2000), ECF No. 1. As in this case, the PSB moved to dismiss the state law counts for lack of jurisdiction, claiming sovereign immunity under the Eleventh Amendment.  Motion to Dismiss, *Mountain Cable*, No. 1:00-cv-00298-jgm (D. Vt. Sept. 25, 2000), ECF No. 4.  Adelphia opposed the motion and simultaneously moved to amend its complaint to include the individual PSB members as defendants.

In an Opinion and Order dated April 2, 2001, the court denied the PSB's motion to dismiss.  *Mountain Cable*, No. 1:00-cv-00298-jgm (D. Vt. Apr. 2, 2001), ECF No. 30.  The court reviewed the provisions of 47 U.S.C. §§ 546(e)(1) and 555(a), and concluded that "[t]he plain language of each of these provisions indicates that this Court has both original and appellate jurisdiction over Adelphia's claims."  *Id.* at 3 (citing *Cablevision of the Midwest, Inc. v. City of Brunswick, Ohio*, 117 F. Supp. 2d 658, 661 (N.D. Ohio 2000)).  In a footnote, the court stated:

_____

[9] Adelphia's challenge was similar to Comcast's challenge in this case.  Adelphia objected to the PSB's requirements upon renewal "regarding Public, Educational and Governmental Access to its cable network; high speed Internet service; itemization on customers' bills for gross revenue tax; average cost per mile of line extensions; and payment of certain of the Department's costs."  *Mountain Cable Co. v. Pub. Serv. Bd. of the State of Vt.*, 242 F. Supp. 400, 402 (D. Vt. 2003).

"Because the Court finds that it has appellate jurisdiction to review the PSB's ruling, it does not consider PSB's Eleventh Amendment arguments." *Id.* at 3 n.2. In a separate Order also dated April 2, 2001, the court denied (without opinion or comment) Adelphia's motion to amend its complaint. The PSB appealed the denial of its motion to dismiss.

While the PSB's appeal was pending in the Second Circuit, the Supreme Court issued its decision in *Verizon Maryland Inc. v. Public Service Commission*, 535 U.S. 635 (2002). *Verizon Maryland* was an appeal from the Fourth Circuit's decision in *Bell Atlantic Maryland, Inc. v. MCI Worldcom, Inc.*, 240 F.3d 279 (4th Cir. 2001), which involved provisions of the Telecommunications Act of 1996 (TCA), 47 U.S.C. §§ 151–614, that are broadly analogous to the Cable Act. The *Bell Atlantic* court held that the action brought by Bell Atlantic (the predecessor to Verizon Maryland, Inc.) against the Maryland Public Service Commission and its individual members in their individual capacity was barred by the Eleventh Amendment. *Bell Atlantic*, 240 F.3d at 309.

On appeal, the Supreme Court did not decide whether the Eleventh Amendment was implicated or whether any sovereign immunity had been waived. The Court found it unnecessary to decide those issues because it concluded that, "even absent waiver, Verizon may proceed against the individual commissioners in their official capacities, pursuant to the doctrine of *Ex parte Young*, 209 U.S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1908)." *Verizon Maryland*, 535 U.S. at 645.

In a concurrence, Justices Souter, Ginsburg, and Breyer noted that the Court's opinion assumed that there was an Eleventh Amendment bar, but questioned that assumption, discussing whether the cases "even implicate the Eleventh Amendment." *Id.* at 649 (Souter, J., concurring). Justice Souter reasoned that what Verizon was seeking was:

12

> [N]ot a simple order of relief running against the state commission, but a different adjudication of a federal question by means of appellate review in Federal District Court, whose jurisdiction to entertain the claim of error the Court today has affirmed.  If the District Court should see things Verizon's way and reverse the state commission *qua* federal regulator, what dishonor would be done to the dignity of the State, which has accepted congressionally conferred power to decide matters of federal law in the first instance?

*Verizon Maryland*, 535 U.S. at 650–51 (Souter, J., concurring) (footnote omitted).  He

concluded: "Whether an issue comes from a state-agency or a state-court decision, the federal

court is reviewing the State's determination of a question of federal law, and it is neither prudent

nor natural to see such review as impugning the dignity of the State or implicating the States'

sovereign immunity in the federal system." *Id.* at 653.

The *Verizon Maryland* decision altered the course of the PSB's appeal of the *Mountain

Cable* case to the Second Circuit.  The Second Circuit reasoned:

> In light of *Verizon Maryland,* and to avoid a constitutional question if it is possible and appropriate to do so, we vacate the district court's order denying Adelphia's motion seeking leave to file an amended complaint adding the individual members of the Board as party defendants.  In addition, we remand to the district court for consideration of Adelphia's motion on the merits.  If the district court grants the motion, it should also express its view as to whether Adelphia can proceed under *Ex Parte Young.*  In remanding to the district court, we intimate no view on the merits of the legal or factual questions to be considered or on any substantive aspects of the earlier proceedings before the district court.

*Better TV, Inc. of Bennington v. Pub. Serv. Bd. of State of Vt.*, 42 F. App'x 498, 500 (2d Cir.

2002) (summary order).  On remand, the court held that *Ex parte Young* applied, and granted

Adelphia's motion to amend the complaint to add the individual PSB members as defendants in

their official capacities.  *Mountain Cable Co. v. Pub. Serv. Bd. of State of Vt.*, 242 F. Supp. 2d

400, 409 (D. Vt. 2003).[10]

---

[10]  The *Mountain Cable* court discussed in detail the exception to *Ex parte Young* announced in *Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996).  The court found no reason to conclude that, by enacting the Cable Act, "Congress intended to supplant federal

The PSB and the newly-named PSB members then filed an additional motion to dismiss, arguing, among other things, that Adelphia's state-law claims were barred by the Eleventh Amendment. Motion to Dismiss, *Mountain Cable*, No. 1:00-cv-00298-jgm (Sept. 15, 2003), ECF No. 57. Adelphia filed an opposition that included an assertion that the suit was an "appeal" and thus did not raise any Eleventh Amendment issues. Opposition, *Mountain Cable*, No. 1:00-cv-00298-jgm (Oct. 14, 2003), ECF No. 62. The case settled before the court ruled on any of those issues.

### B.       Statutory Basis for Jurisdiction

The VPUC does not challenge the court's jurisdiction to adjudicate Comcast's federal claims under the Cable Act and the Constitution. Although the court in *Mountain Cable* suggested that it had both original and "appellate" jurisdiction, it is enough to say here that the court undoubtedly has jurisdiction to review Comcast's federal claims under 28 U.S.C. § 1331 and 47 U.S.C. §§ 546(e)(1) and 555(a)(1).[11] As for supplemental jurisdiction over Comcast's state-law claims under 28 U.S.C. § 1367, the VPUC does not claim that § 1367 is inapplicable, but instead argues that the relief Comcast seeks is barred by the Eleventh Amendment. (Doc. 32 at 5.) Sovereign immunity is jurisdictional. *Beaulieu*, 807 F.3d at 491. The court accordingly

---

courts' power under *Ex Parte Young*, and replace that judge-made rule with its own comprehensive statutory remedies." *Mountain Cable*, 242 F. Supp. 2d at 407.

[11] Regarding the implications of "appellate" jurisdiction on the question of sovereign immunity, the court has considered Justice Souter's suggestion in *Verizon Maryland* that federal "appellate" review under some cooperative federalism statutes might not implicate sovereign immunity at all. But Justice Souter's analysis was limited to federal court review of a state's determination of a question of *federal* law. It offers little guidance when the question is one of independent state law. The court concludes that the better approach in this case is—as in *Verizon Maryland*—to assume that Comcast's claims do implicate the Eleventh Amendment. The parties' filings in this case do the same.

focuses on the sovereign immunity questions—namely, whether the VPUC enjoys Vermont's sovereign immunity, and whether any exceptions to that immunity apply in this case.

### C.     Is the VPUC an Arm of the State?

Sovereign immunity is enjoyed by states and state entities that are an "arm of the state," but not by "independent" instrumentalities or local governments or municipalities. *Leitner v. Westchester Cmty. Coll.*, 779 F.3d 130, 134 (2d Cir. 2015). Defendants maintain that the VPUC is an arm of the state because it has all of the powers and functions of a state court. (Doc. 43 at 3.) Comcast suggests that the VPUC is not entitled to sovereign immunity under the arm-of-the-state doctrine, in part because there is no risk to the Vermont treasury in this case. (Doc. 38 at 19–20.)

"The Second Circuit has applied two different tests to determine whether government entities are 'arms of the state' entitled to sovereign immunity under the Eleventh Amendment." *Leitner*, 779 F.3d at 134–35. The court has considered both of those tests, but has determined that it is unnecessary to discuss them here because, for the reasons below, the court concludes that Vermont has waived any sovereign immunity that the VPUC might enjoy when acting as the franchising authority for cable television.

### D.     Waiver

Comcast presents both abrogation and waiver arguments; the court begins with the latter. A state can elect to waive its general sovereign immunity either in federal or state court. *Beaulieu*, 807 F.3d at 483. This court generally refers to state law to determine whether Vermont has waived its general sovereign immunity. *Id.* at 484. "Vermont courts have concluded that Vermont's state sovereign immunity can be waived only "expressly by statute." *Id.* (quoting *Jacobs v. State Teachers' Ret. Sys. of Vt.*, 174 Vt. 404, 408, 816 A.2d 517, 521

(2002)).  "[I]n assessing whether a state has made a knowing and intentional waiver, the Supreme Court has instructed that 'every reasonable presumption against waiver' is to be indulged."  *Garcia v. S.U.N.Y. Health Sciences Ctr. of Brooklyn*, 280 F.3d 98, 114 (2d Cir. 2001) (quoting *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 682 (1999)).

Here, Comcast points to no express waiver in any provision of the Vermont statutes.  As *Beaulieu* suggests, however, there are some potential exceptions to the general rule that Vermont's state sovereign immunity can be waived only expressly by statute.  Comcast argues that the VPUC's participation in a federal-state regulatory scheme for cable television constitutes such a waiver.  Comcast asserts that Vermont waived its sovereign immunity by vesting the VPUC with franchising authority under the Cable Act—30 V.S.A § 502(b)—and by doing so "with knowledge of the cooperative federal-state framework that Congress established in the 1984 Cable Act, including the clear prospect of federal court review of the VPUC's cable franchising decisions." (Doc. 38 at 18.)  Comcast cites several cases in support, including *Islander East Pipeline Co. v. Connecticut Department of Environmental Protection*, 482 F.3d 79 (2d Cir. 2006).  (Doc. 38 at 19.)  Defendants maintain that Comcast's position is unsupported by any case and that Vermont has not "constructively" waived its sovereign immunity under what Defendants say is a four-part test articulated in *Islander*.  (Doc. 43 at 5.)

Comcast's position invokes a form of constructive waiver that one commentator has dubbed "regulation as waiver."  Sarah C. Rispin, *Cooperative Federalism & Constructive Waiver of State Sovereign Immunity*, 70 U. Chi. L. Rev. 1639, 1640 (2003) [hereinafter *Cooperative Federalism*].  The theory is that "states will be presumed to have constructively waived their sovereign immunity by agreeing to participate as regulators in cooperative

16

federalism regulatory schemes, where the federal statute makes it clear that the state will be subject to suit in federal court for its actions as regulator." *Id.* As the Second Circuit noted in *Islander*, the Supreme Court in *College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board*, 527 U.S. 666 (1999), inferred a "State waiver of immunity from the State's acceptance of a 'gratuity' offered by Congress conditioned on the State's willingness to be subject to suit in federal court." *Islander*, 482 F.3d at 89. The Second Circuit in *Islander* found that such a constructive waiver was present in that case.

In *Islander*, the Federal Energy Regulatory Commission (FERC), acting under the Natural Gas Act of 1938 (NGA), granted the Islander East Pipeline Company's (Islander) requests for authorization to construct and operate a natural gas pipeline through Connecticut and New York, with part of the pipeline crossing Long Island Sound. But the Connecticut Department of Environmental Protection (CTDEP)—acting as a regulator under the authority of the federal Clean Water Act (CWA)—denied Islander's application for a Water Quality Certificate (WQC), finding that the proposed pipeline work would be inconsistent with Connecticut Water Quality Standards. Since FERC was required to ensure that the project complied with relevant federal laws (including the CWA), and since the NGA did not preempt state authorizations required under federal law, CTDEP's denial imperiled Islander's application.

Islander filed an action in Connecticut state court challenging the CTDEP's denial. Then, while the state proceedings were pending, the Energy Policy Act of 2005 (EPACT) was signed into law. Section 19(d) of the EPACT permitted an expedited direct cause of action in the federal appellate courts to challenge state administrative agency action regarding a permit application required under federal law to proceed with a natural gas facility project under the NGA. Islander immediately filed a petition for expedited review in the Second Circuit Court of

17

Appeals under section 19(d). In the Second Circuit, CTDEP argued that it enjoyed Eleventh
Amendment immunity from suit. Islander argued that CTDEP had effectively waived its
Eleventh Amendment immunity by electing to participate in the regulatory framework
established by the NGA and the CWA.

The *Islander* court recognized that the Supreme Court in *Verizon Maryland* had "declined
to rule on the issue of whether a State may be deemed to have waived its Eleventh Amendment
immunity by participating in a federal regulatory scheme." *Islander*, 482 F.3d at 90 n.8. But the
*Islander* court observed that the Courts of Appeals have uniformly held that "state agencies that
regulate agreements under the TCA knowingly waive their Eleventh Amendment immunity by
voluntarily accepting the power to regulate local telecommunications competition." *Id.* at 89.
The court reasoned that "[a]s with the TCA, Congress wholly preempted and completely
federalized the area of natural gas regulation by enacting the NGA." *Id.* at 90. The court noted
that under the CWA, "Congress provides states with the option of being deputized regulators
under the authority of federal law." *Id.*

CTDEP did not dispute "that by accepting a role as deputized regulator under the CWA, a
state agrees to waive its immunity from suit under section 19(d) of the NGA." *Id.* Instead,
CTDEP argued that "it never waived its Eleventh Amendment immunity from suit under
section 19(d) because this provision was passed into law only after the CTDEP denied Islander
East's WQC application." *Id.* The Second Circuit rejected that argument, reasoning that "by
going forward with its federally deputized role even after the EPACT's enactment, Connecticut
has now knowingly waived its immunity from section 19(d) suit in order to receive the benefits
of participating in the NGA and CWA regulatory scheme." *Id.* at 91. The court concluded that
"once Congress enacted section 19(d), Connecticut was on notice that its continued participation

in the NGA and CWA regulatory scheme would constitute a waiver of its Eleventh Amendment immunity with respect to all suits under section 19(d)." *Id.*

Defendants in this case assert that *Islander* requires four elements for regulation as waiver: (1) wholesale preemption and complete federalization of the regulatory area; (2) congressional offer to the states of the option of being deputized regulators under federal law; (3) state acceptance of that offer in order to receive the benefits of participating in the regulatory scheme; such that (4) the state knowingly waived its immunity.  (Doc. 43 at 5.)  The VPUC responds that the Cable Act does not wholly preempt or completely federalize the area of cable regulation, and that the VPUC is not limited merely to a "federally deputized role" of applying only the federal Cable Act standards.  (*Id.* at 5–6.)

The *Islander* court stated that wholesale preemption and complete federalization of the regulatory area are present in both the TCA and the NGA.  *Islander*, 482 F.3d at 90.  The Cable Act, by contrast, stops short of attempting to wholly preempt or completely federalize cable regulation.  Several areas of cable regulation remain within exclusive state and local control.[12] Courts have confirmed that the Cable Act does not entirely displace state law.  *See, e.g.*, *Parker v. Time Warner Entm't Co., L.P.*, No. 98 CV 4265(ERK), 1999 WL 1132463, at *12 (E.D.N.Y. Nov. 8, 1999) ("Congress did not expressly or impliedly preempt the field of provision of cable services . . . ."); *Cablevision of Boston, Ltd. P'Ship v. Flynn*, 710 F. Supp. 23, 28 (D. Mass.

---

[12] *See* 47 U.S.C. § 552(d)(1) ("Nothing in this subchapter shall be construed to prohibit any State or any franchising authority from enacting or enforcing any consumer protection law, to the extent not specifically preempted by this subchapter."); *id.* § 556(a) ("Nothing in this subchapter shall be construed to affect any authority of any State, political subdivision, or agency thereof, or franchising authority, regarding matters of public health, safety, and welfare, to the extent consistent with the express provisions of this subchapter."); *id.* § 556(b) ("Nothing in this subchapter shall be construed to restrict a State from exercising jurisdiction with regard to cable services consistent with this subchapter.").

1989) ("[I]n enacting the Cable Act, Congress did not intend to 'totally occupy' the field of cable television services.").

But the court does not read *Islander* as requiring wholesale preemption and complete federalization in order for constructive waiver to apply. Notably, the regulatory scheme at issue in *Islander* included not only the NGA but also the CWA. And the CWA assigns a "distinct" role to the states in regulating water quality, including, among other things, allowing states to impose "more stringent water quality controls than are required under [the CWA's] terms." *Islander*, 482 F.3d at 90 n.9 (citing 33 U.S.C. § 1370); *see also Stoddard v. W. Carolina Reg'l Sewer Auth.*, 784 F.2d 1200, 1207 (4th Cir. 1986) (Clean Water Act "specifically provides that pollution be controlled by state law if that law satisfies the federal act").

The regulatory scheme at issue in *Islander*—comprised of both the NGA and the CWA—therefore did not establish wholesale preemption or complete federalization. The reason that the *Islander* mentioned the NGA's preemption and federalization was to introduce the separate observation that the NGA did not supersede any other federal statutory requirements, such as the CWA. The *Islander* court was not establishing an element for constructive waiver. The fact that Congress did not wholly preempt or completely federalize the area of cable television regulation when it enacted the Cable Act does not defeat the possibility of constructive waiver.

The court is not persuaded by Defendants' argument that regulation as waiver applies only if the state regulator is limited to enforcement of the standards in the applicable federal act. The *Islander* decision shows why. Since Connecticut could impose water quality standards that are more stringent than the CWA standards, the CTDEP was not limited to applying the CWA's standards. *Islander*, 482 F.3d at 90 n.9. Indeed, the CTDEP denied the WQC because it found

that the proposed pipeline work would be inconsistent with *Connecticut's* water quality standards.

Having rejected Defendants' arguments, the court concludes that the requirements for regulation as waiver are satisfied in this case. As the *Islander* court recognized, a state's waiver of immunity can be inferred from "the State's acceptance of a 'gratuity' offered by Congress conditioned on the State's willingness to be subject to suit in federal court." *Islander*, 482 F.3d at 89 (citing *College Savings*, 527 U.S. at 686–87).[13] Those conditions are satisfied here. In the Cable Act, Congress offered a gratuity in the form of the opportunity to regulate cable television that would have been unavailable if Congress had not carved out a specific role for the states. As in the case of section 19(d) of the EPACT, the Cable Act gives unambiguous notice that the gratuity is conditioned on a waiver of immunity. *See* 47 U.S.C. § 555. Judicial review in state or federal court is an essential part of the package of state regulation conducted pursuant to federal legislation. Vermont voluntarily accepted the offer by electing to regulate under the Cable Act.[14] By entering into this regulatory relationship, Vermont subjected the VPUC to judicial review by the federal district court.

---

[13] *See also* Rispin, *Cooperative Federalism*, 70 U. Chi. L. Rev. at 1653 ("Connecting the dots between what the Court forbids and what it acknowledged it still allows in *College Savings*, it follows that a constructive waiver of state sovereign immunity may still be found where (i) Congress offers a 'gift' or 'gratuity' as seen in *Dole* or *Petty* in exchange for a state waiver of state sovereign immunity, (ii) the terms of the legislation make it clear that by accepting the gift or gratuity, the state in fact consents to suit, and (iii) acceptance of that gift or gratuity is truly voluntary.").

[14] The history of the provisions in Title 30, chapter 13 ("Cable Television Systems") of the Vermont Statutes Annotated confirm that the state has embraced the Cable Act's offer. *See* 30 V.S.A. §§ 501–518. Before the passage of the Cable Act, Vermont was one of a handful of states that had taken direct control of cable through its statewide public utilities board. Patrick R. Parsons, *Blue Skies: A History of Cable Television* 294 (2008). Passage of the Cable Act in 1984 "provided a statutory stamp of approval on the franchising processes" at the state and municipal levels. *Id.* at 477. Vermont subsequently updated the provisions of Title 30, chapter 13 when it passed the "Vermont Cable Television Reform Act of 1988." The Vermont

The impact of Vermont's waiver in this case means that sovereign immunity is no impediment to the court's adjudication of any of Comcast's claims. Because waiver applies, the court need not rely on the *Ex parte Young* exception to Eleventh Amendment sovereign immunity to adjudicate Comcast's federal claims. The court's determination that waiver—and not the *Ex parte Young* doctrine—provides Comcast with the basis for litigating all claims against the VPUC in federal district court has consequences in this case.

The first consequence relates to the proper defendants in this case. The *Mountain Cable* court invoked the *Ex parte Young* exception as the doctrine that allowed the plaintiffs in that case to pursue injunctive relief restraining state officials from enforcing an order that allegedly violated federal law. *Mountain Cable*, 242 F. Supp. 2d at 404. In light of the court's waiver analysis above, it is no longer necessary to rely on that exception. That simplifies this case because it is no longer necessary to name both the VPUC and its individual members as defendants; Comcast can proceed against the VPUC alone on all claims.

A second and more important consequence relates to the scope of claims that can be heard in this federal case, as compared to those that could be heard on an *Ex parte Young* theory. The waiver in this case applies equally to claims based on federal and state law. In contrast, *Ex parte Young* claims are limited to alleged violations of federal law. *Tsirelman v. Daines*, 794 F.3d 310, 313–14 (2d Cir. 2015). In determining that Vermont waived immunity to judicial review of actions taken by the VPUC when it accepted authority to regulate cable providers under the Cable Act, the state also consented to judicial review of questions arising under state

legislature declared that the purpose of that act was "to implement the state's authority to regulate cable television systems to the full extent allowed under federal law." 1987, No. 271 (Adj. Sess.), § 2. Notably, the Vermont legislature amended the statutory provisions regarding jurisdiction to use language consistent with the Cable Act. *See id.* § 4 (amending 30 V.S.A. § 502 to indicate, among other things, that the PSB is the "franchising authority"). In short, the Cable Act offered the opportunity to regulate, and Vermont took that opportunity.

and federal law. The alternative would require two parallel proceedings in state and federal court (or a state court case only). While the Cable Act contemplates judicial review in either forum, it does not make any provision for judicial review in the federal courts which is partial and restricted to violations of federal law only.

There is a remaining question about whether Counts 4–6 state plausible claims, but that is unrelated to questions of jurisdiction or immunity.

**III.    Whether Counts 4–6 Fail to State "Federal Preemption" Claims**

Comcast's amended Counts 4–6 allege that the "application" of each of the enumerated Vermont laws (30 V.S.A. §§ 504, 506, 509, 517 and 18-1 Vt. Code R. § 29:8.313) is preempted by 47 U.S.C. § 556(c) and the Supremacy Clause. (Doc. 29 ¶¶ 147–163.) Comcast describes Counts 4–6 as its "federal preemption claims." (Doc. 38 at 10.) Comcast argues that it is not asking the court "to order the VPUC to conform its franchising decisions to the Vermont laws at issue in those counts, much less to invalidate any Vermont laws." (*Id.*) Instead, Comcast asserts that "the *contested franchise provisions* imposed by the VPUC based on—and in violation of— these state laws conflict with the Cable Act, and thus are preempted by Section 556(c) and invalid under the Supremacy Clause." (*Id.*)

Defendants assert that Comcast's Counts 4–6 fail to state federal preemption claims. (Doc. 43 at 6.) Defendants maintain that Comcast has no private right of action for preemption under 47 U.S.C. § 556(c). (*See* Doc. 43 at 6–7.) Section 556(c) is the Cable Act's general preemption provision: "Except as provided in section 557 of this title, any provision of law of any State, political subdivision, or agency thereof, or franchising authority, or any provision of any franchise granted by such authority, which is inconsistent with this chapter shall be deemed to be preempted and superseded." 47 U.S.C. § 556(c). Comcast replies that it is not claiming a

23

right of action under § 556(c). Instead, Comcast maintains that its "federal preemption" claims are properly before the court either by presenting a federal question under *Ex parte Young* or under the provisions of 47 U.S.C. §§ 546(e) and 555(a)(1). (Doc. 38 at 11–12.)

Comcast's reliance on *Ex parte Young* may be unnecessary. For the reasons stated above, the application of waiver in this case means that it is unnecessary to rely on *Ex parte Young* at all.[15] It seems more likely that Comcast has a statutory cause of action for Counts 4–6 under the judicial review provision of the Cable Act. If any of the franchise provisions are inconsistent with federal law—an issue the court is not ruling on here—then those provisions are preempted under § 556(c) or under some more specific provision of the Cable Act. Courts in other Cable Act cases have reviewed franchise provisions to determine whether those provisions are preempted. *See, e.g.*, *Cablevision Sys. Corp. v. Town of E. Hampton*, 862 F. Supp. 875 (E.D.N.Y. 1994). For these reasons, the court will not dismiss Counts 4–6 pursuant to Fed. R. Civ. P. 12(b)(6).

## IV.   First Amendment Violation Claim (Count 8)

Count 8 of Comcast's Amended Complaint alleges a First Amendment violation stemming from the Renewal CPG's conditions relating to cable television line extensions. In order to understand the VPUC's motion to dismiss Comcast's First Amendment claim, it is necessary to review Comcast's allegations regarding the line extension conditions. The court

---

[15] Even if it were necessary to proceed on an *Ex parte Young* theory, Defendants' arguments about Comcast's pleading are unavailing. Defendants argue that Comcast failed to frame Counts 4–6 as *Ex parte Young* claims, and that Counts 4–6 name or reference only the VPUC, which would be an improper *Ex parte Young* defendant. (Doc. 43 at 7–8.) But Counts 4–6 each incorporate the allegations in the preceding paragraphs of the Amended Complaint, including paragraph 8. (Doc. 29 ¶¶ 147, 152, 157.) Paragraph 8 states that the individual Defendants—Ms. Hofmann and Mr. Volz—are sued in their official capacity under the *Ex parte Young* doctrine. (*Id.* ¶ 8.) If *Ex parte Young* were necessary for Counts 4–6, Comcast's pleading properly invokes it.

then proceeds to summarize the parties' positions and to analyze the VPUC's motion to dismiss the First Amendment claim.

### A.     Conditions Relating to Line Extensions

Comcast asserts that its Renewal Proposal addressed Comcast's obligation to expand cable service into unserved Vermont areas by incorporating the requirements of Vermont's statewide cable line extension policies and guidelines as embodied in 18-1 Vt. Code. R. § 29:8.313 ("Rule 8.313").  (Doc. 29 ¶ 81.)  According to Comcast, Rule 8.313 "requires that each cable company file a statement of the company's policy on expansions of cable television lines into unserved areas as a tariff for the VPUC's approval, and establishes minimum requirements that each policy must satisfy." (*Id.* ¶ 37.)  Comcast says that Rule 8.313 "sets forth formulas and guidelines designed to maximize access to cable service by obliging cable operators to construct line extensions to uncabled areas where it makes economic sense to do so." (*Id.*)  "The rules regulate extensions both where (a) dwelling densities and consumer requests justify the costs of construction and (b) extensions will require contributions in aid of construction from customers." (*Id.*)

The Vermont Department of Public Service (the "Department") did not object to Comcast's proposed condition that would require Comcast to abide by Rule 8.313.  (Doc. 29-2 at 82.)  But the Department recommended an additional condition that would require Comcast to construct 550 miles of line extensions to currently unserved Vermont areas during the 11-year term of the CPG.  (*Id.*)  Comcast opposed the Department's recommendation as costly, unfair, and potentially discriminatory.  (*Id.* at 88.)  Comcast argued that similar line extension requirements had not been imposed on other Vermont cable operators.  (*Id.* at 89.)  And Comcast objected to the Department's use of Comcast's "profitability, history of line extension

25

completions, and prior construction budgets as a basis for imposing additional obligations on Comcast." (*Id.*)

In its Renewal Order, the VPUC stated that "Comcast is by far the largest and most significant provider of cable television services in Vermont." (Doc. 29-2 at 4.)  In its discussion of the proposed line extension conditions, the VPUC adopted the Department's proposed condition, finding it to be "supported by the needs and interests of the state for additional line extensions to increase the availability of service in rural and other unserved areas of the state." (*Id.* at 89.)  The VPUC found the condition to be "reasonable after taking into account the costs of meeting such needs and interests." (*Id.*)

The VPUC acknowledged that the Department had emphasized the profitability of Comcast's Vermont operations and the number of miles of line extensions in construction budgets.  But the VPUC reasoned that "the Department's emphasis on these matters is not intended to provide the basis for its proposed line extension requirement, as Comcast suggests, but rather is directed at establishing the financial viability of its proposal to require Comcast to help meet an important state need." (*Id.* at 89–90.)  The VPUC found that "[t]he evidence presented by the Department is adequate to support the conclusion that the costs of the line extensions to Comcast will not impair Comcast's ability to provide service or to continue to earn a fair and reasonable return on its investments." (*Id.* at 90.)

The VPUC concluded that the Department's proposed line extension condition "will help address important state needs and interests, [and] affords Comcast flexibility in determining where, when, and how to meet these line extension obligations over the term of the CPG." (*Id.* at 5.)  The Renewal CPG accordingly included the following condition (Condition 33):

> Comcast shall construct no less than 550 miles of line extensions into uncabled areas during the term of this CPG.  Comcast may satisfy this obligation either by

fully funding the line extensions or by collecting contributions-in-aid-of-
construction from customers pursuant to its line extension tariff.  Any line
extensions that are funded by a grant from any federal or state governmental
agency shall not be used to satisfy this requirement.  Comcast shall annually file
with the Board and the Department a report that details all line extensions
completed during the prior calendar year.  This report shall, at minimum, describe
the length and location of all completed line extensions and the funding source for
such extensions.

(Doc. 29-1 at 10–11.)  As described by Comcast, two other conditions—Conditions 13(7)

and 34—"together retain and modify a condition from the prior CPG that imposes unique and

burdensome obligations on Comcast to 'perform and provide an annual calculation of qualifying

density in support of Comcast's line extension tariff.'"  (Doc. 29 ¶ 85.)[16]  Comcast asserts that

compliance with Condition 33 "will cost millions of dollars."  (Doc. 29 ¶ 84.)

### B.    The Parties' Positions

In Count 8 of its Amended Complaint, Comcast alleges that the 550-mile line extension

requirement in Condition 33 violates Comcast's First Amendment rights.  According to Comcast,

---

[16] Condition 13(7) states that, at the time it files its annual report under 30 V.S.A. § 22,
Comcast must also file with the Board: "[T]he annual calculation of qualifying density ("H") for
the purpose of Comcast's line-extension policy in accordance with the formula set forth in the
Orders in Docket 6101 and condition 34 below."  (Doc. 29-1 at 6.)  Condition 34 states:

Line extensions shall be built on request without customer contribution in
accordance with Comcast's line extension tariff based on an annual calculation of
the minimum average number of verified subscribers per mile ("Qualifying
Density" or "H") for the next calendar year.  Comcast shall report the basis for its
calculation of Qualifying Density with its Annual Report to the Department.  The
calculation shall be performed based on the formula set forth in the Board's
Orders in Docket 6101 and shall use revenue data from the Annual Report to the
Department and Comcast's average construction cost per mile for qualifying line
extensions during the prior year as the assumed construction cost per mile.
Comcast may use current data for all other parameters in the formula, including
the carrying charge factor.  To the extent possible, all elements of the formula
should be based on the same time period.  If audited financial statements are not
available, Comcast shall use unaudited numbers.  Any calculation of the
Qualifying Density shall be subject to review by the Board.

(Doc. 29-1 at 11.)

Condition 33 "is a unique and discriminatory requirement imposed by the VPUC on Comcast that constitutes a speaker-based burden on Comcast's speech rights." (Doc. 29 ¶ 175.)  Comcast asserts that "[n]o other cable operators in Vermont have been burdened by such a requirement." (*Id.*)  According to Comcast, the VPUC has failed to justify Condition 33 as necessary or narrowly tailored to serve a compelling state interest.  (*Id.* ¶ 177.)  Comcast maintains that "VPUC's real interest is not the expansion of cable access to unserved areas under any rational, non-discriminatory basis, but instead is a special operating tax imposed on Comcast based on its size and overall profitability."  (*Id.* ¶ 94.)

Defendants maintain that Comcast's First Amendment claim should be dismissed because Condition 33 "advances important governmental interests and does not burden substantially more speech than necessary to further those interests."  (Doc. 22 at 12.)  Defendants concede that Comcast is entitled to some level of heightened scrutiny under the First Amendment, but asserts that Condition 33 is a content-neutral restriction, and so intermediate scrutiny applies even if Condition 33 is a speaker-specific restriction.  (*Id.* at 13–14.)  According to Defendants, Condition 33 passes intermediate scrutiny because it advances Vermont's important interest in expanding access to cable services and does not burden substantially more speech than necessary to further that interest.  (*Id.* at 15–21.)

Comcast responds that Condition 33 singles out Comcast for disparate regulatory treatment, and that such discriminatory treatment triggers strict scrutiny.  (Doc. 38 at 23–24.) Comcast maintains that the line extension provisions cannot survive review under strict scrutiny. (*Id.* at 26.)  And Comcast asserts that the line extension provisions do not survive review even under intermediate scrutiny.  (*Id.*)  Defendants reply that intermediate (not strict) scrutiny is applicable because Comcast does not allege any content discrimination.  (Doc. 43 at 8.)  And

Defendants maintain that the line extension conditions pass intermediate scrutiny.  (*Id.* at 10.)
Defendants argue, among other things, that the conditions further Vermont's interest in
expanding broadband infrastructure.  (*Id.* at 11.)  In a sur-reply, Comcast asserts that the Cable
Act prohibits franchising authorities from imposing broadband conditions in cable franchise
renewals, and that Defendants' broadband argument "further demonstrates the unlawfulness of
this discriminatory condition."  (Doc. 48 at 2.)

### C.   Appropriate Level of Scrutiny

The First Amendment provides that "Congress shall make no law . . . abridging the
freedom of speech, or of the press."  U.S. Const. amend. I.  Although this language "speaks in
terms of what is forbidden to 'Congress,' it has, of course, long been established that 'the
conception of liberty under the due process clause of the Fourteenth Amendment embraces the
right of free speech,' . . . and that its provisions therefore apply to state governments."  *Lusk v.
Vill. of Cold Spring*, 475 F.3d 480, 485 (2d Cir. 2007) (quoting *Stromberg v. California*,
283 U.S. 359, 368 (1931)).  The parties agree that Comcast engages in and transmits protected
First Amendment speech.  *See Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 636 (1994)
(*Turner I*) ("Cable programmers and cable operators engage in and transmit speech, and they are
entitled to the protection of the speech and press provisions of the First Amendment." (citing
*Leathers v. Medlock*, 499 U.S. 439, 444 (1991))).  But the parties disagree about the appropriate
level of First Amendment scrutiny in this case: Comcast advocates for strict scrutiny, while
Defendants maintain that intermediate scrutiny applies.[17]

---

[17] A restriction on protected speech survives strict scrutiny "only upon a showing that it is
narrowly tailored to a compelling government interest."  *Time Warner Cable Inc. v. FCC*,
729 F.3d 137, 155 (2d Cir. 2013).  A restriction on speech survives intermediate scrutiny if it
"(1) 'advances important governmental interests unrelated to the suppression of free speech' and

The Second Circuit has observed that "[c]ourts have consistently reviewed challenges to the Cable Act and regulations promulgated pursuant thereto under intermediate scrutiny." *Time Warner Cable Inc. v. FCC*, 729 F.3d 137, 155 (2d Cir. 2013) (citing cases). Comcast argues that this case is different and warrants the highest level of scrutiny because the cable line extension requirement is a speaker-based restriction. According to Comcast, the VPUC "single[d] out Comcast because it is the State's largest cable operator." (Doc. 38 at 26.) At oral argument, Comcast also asserted that the line extension requirements force Comcast to speak where Comcast does not want to do so, and thus constitutes compelled speech. (*See* Doc. 55 at 41.)

### 1.   *Turner I*

The court begins by reviewing the Supreme Court's decision in *Turner I*. Cable programmers and operators in that case challenged the constitutionality of "must carry" provisions in the Cable Act that "require cable operators to carry the signals of a specified number of local broadcast stations." *Turner I*, 512 U.S. at 630. The number of broadcast stations that the cable operators are required to carry depends on the size of the cable systems. Very small cable systems (fewer than 12 active channels and 300 subscribers) are generally exempt, but larger systems are required to carry progressively more broadcast stations. *See id.* at 630–32 (describing applicable provisions). The cable operators argued that the must-carry provisions abridge freedom of speech and of the press in violation of the First Amendment. The Supreme Court began its analysis with a discussion of the level of scrutiny applicable to the must-carry provisions. *Id.* at 637.

After concluding that "some measure of heightened First Amendment scrutiny is demanded," *id.* at 641, the Court analyzed whether the must-carry rules triggered strict scrutiny

(2) 'does not burden substantially more speech than necessary to further those interests.'" *Id.* at 160 (quoting *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 189 (1997)).

as regulations that impact speech on the basis of its content. *Id.* at 641–52. The Court concluded

that the must-carry provisions are facially content-neutral. *Id.* at 643. The Court also considered

whether, despite that facial neutrality, the "manifest purpose" of the must-carry provisions is to

regulate speech because of its content. *Id.* at 645. The Court found the cable operators'

hypotheses of a content-based purpose to be speculative, and concluded that the purpose was

content-neutral: "to protect broadcast television from what Congress determined to be unfair

competition by cable systems." *Id.* at 652.

      The Court then discussed the cable operators' three additional arguments for strict

scrutiny—that the must-carry provisions: "(1) compel speech by cable operators, (2) favor

broadcast programmers over cable programmers, and (3) single out certain members of the press

for disfavored treatment." *Id.* at 653. The Court concluded that none of those arguments

required the application of strict scrutiny to the must-carry provisions. *Id.*

      Regarding compelled speech, the Court discussed its earlier decision in *Miami Herald*

*Publishing Co. v. Tornillo*, 418 U.S. 241 (1974), which affirmed the "essential proposition" that

"[t]he First Amendment protects the editorial independence of the press." *Turner I*, 512 U.S.

at 653. The Court in *Tornillo* struck down a Florida statute that "required any newspaper that

assailed a political candidate's character to print, upon request by the candidate and without cost,

the candidate's reply in equal space and prominence." *Id.* The "right-of-reply" statute

constituted "an impermissible intrusion on newspapers' 'editorial control and judgment.'" *Id.*

(quoting *Tornillo*, 418 U.S. at 258). The *Turner I* Court concluded that *Tornillo* did not control.

The Court observed that the must-carry rules are content neutral in application; that they do not

force cable operators to alter their own messages; and that cable operators' ownership of the

31

"essential pathway for cable speech" gave them a unique ability (or "bottleneck" power) to silence the voices of competing speakers. *Id.* at 655–57.

The cable operators also argued that strict scrutiny applied because the must-carry provisions "favor one set of speakers (broadcast programmers) over another (cable programmers)." *Id.* at 657.  The Court expressly rejected the proposition that all speaker-partial laws trigger strict scrutiny. *See id.* at 658 (rejecting cable operators' "broad assertion that all speaker-partial laws are presumed invalid").  Instead, the Court held that "strict scrutiny applies to regulations reflecting 'aversion' to what 'disfavored speakers' have to say." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565 (2011) (quoting *Turner I*, 512 U.S. at 658).  In the Court's view, the question was "whether Congress preferred broadcasters over cable programmers based on the content of programming each group offers." *Turner I*, 512 U.S. at 658–59.  Referring to its previous discussion about whether the must-carry provisions affect speech on the basis of its content, the Court concluded that the provisions do not prefer any speaker on the basis of the content of programming. *Id.* at 659.

Finally, the Court considered the cable operators' argument that strict scrutiny should apply because the must-carry provisions "single out" certain members of the press (cable operators) for disfavored treatment. *Id.* at 659.  The cable operators noted that Congress had not imposed similar must-carry provisions on other video delivery systems, such as satellite master antenna television systems.  Relying on cases that invalidated discriminatory taxation of the press—such as *Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue*, 460 U.S. 575 (1983)—the cable operators argued that such differential treatment should be presumed invalid. *Turner I*, 512 U.S. at 659.

32

The Supreme Court recognized that regulations that discriminate among different speakers within a medium (such as cable television) "often present serious First Amendment concerns." *Id.* The Court discussed its earlier decision in *Minneapolis Star*, in which the Court applied strict scrutiny to a tax imposed on the paper and ink used in newspaper production. The *Minneapolis Star* Court applied the highest level of scrutiny because the tax singled out the press and because it targeted a small group of newspapers: the largest publications. *Minneapolis Star*, 460 U.S. at 591. The Minnesota tax "targeted a small number of speakers, and thus threatened to 'distort the market for ideas.'" *Turner I*, 512 U.S. at 660 (quoting *Leathers v. Medlock*, 499 U.S. 439, 448 (1991)). Although there was no evidence of an illicit governmental motive behind the tax, it was "structured in a manner that raised suspicions that [the] objective was, in fact, the suppression of certain ideas." *Id.*

But the *Turner I* Court explicitly stated that it would be error to conclude from cases like *Minneapolis Star* "that the First Amendment mandates strict scrutiny for any speech regulation that applies to one medium (or a subset thereof) but not others." *Id.* "[S]uch heightened scrutiny is unwarranted when the differential treatment is 'justified by some special characteristic of' the particular medium being regulated." *Id.* at 660–61 (quoting *Minneapolis Star*, 460 U.S. at 585). The *Turner I* Court reasoned that there was precisely such a justification for the must-carry provisions: "the bottleneck monopoly power exercised by cable operators and the dangers this power poses to the viability of broadcast television." *Id.* at 661. The Court also reasoned that the must-carry provisions are not structured in a way that carries an inherent risk of undermining First Amendment interests, since the regulations are "broad based, applying to almost all cable systems in the country, rather than just a select few." *Id.*

33

### 2.    Compelled Speech

With the *Turner I* decision in mind, the court proceeds to analyze Comcast's argument that the cable line extension requirements constitute compelled speech.[18]  This case is unlike *Tornillo* for many of the same reasons that *Turner I* is unlike *Tornillo*.  Similar to the must-carry provisions at issue in *Turner I*, the line extension requirements are "content neutral in application." *Turner I*, 512 U.S. at 655.  Condition 33 is not "activated by any particular message spoken by" Comcast, and "thus exact[s] no content-based penalty." *Id.*  Comcast does not claim otherwise.  But Comcast does assert that the line extension requirements will force it to alter its messages and will ultimately reduce the number of people receiving Comcast's speech.

Comcast complains that it is being compelled to incur expenses building communications infrastructure at a pace or in locations that Comcast does not prefer.  (*See* Doc. 29 ¶ 82 ("Condition 33 imposes an arbitrary line extension obligation without consideration of the specific locations and the potential customers served by the mandated extension."); *id.* ¶ 84 ("Compliance with this arbitrary requirement will cost millions of dollars.").)  According to Comcast, spending money building what it views to be "arbitrary" miles of cable lines means that Comcast will have less money "to acquire content" and "to make those sort of editorial choices that the Supreme Court recognized in *Turner*." (Doc. 55 at 41:22–24.)  As Comcast puts

---

[18] Comcast did not advance its compelled-speech theory in the Amended Complaint or in the briefing, but raised it for the first time at oral argument.  At argument on April 16, 2018, counsel for Defendants remarked that he had not heard of Comcast's compelled-speech theory before that day.  (Doc. 55 at 72:21–22.)  "Generally, courts do not consider arguments raised for the first time in a reply brief," let alone those raised for the first time at argument after briefing is complete. *Montanio v. Keurig Green Mountain, Inc.*, 276 F. Supp. 3d 212, 223 (D. Vt. 2017); *see also Standard Gen. L.P. v. Travelers Indem. Co. of Conn.*, 261 F. Supp. 3d 502, 511 (S.D.N.Y. 2017) ("This Court need not consider an argument raised for the first time at oral argument.").  But Defendants did not explicitly object to Comcast's newly-raised compelled-speech theory, and instead ably proceeded to discuss it at oral argument.  The court accordingly elects to address the compelled-speech issue.

it, diverting money to pay for cable line extensions "is diverting resources that could otherwise go to new content that we would use to try to attract and retain subscribers." (*Id.* at 38:2–4.) And Comcast says that building the mandated cable lines will result in higher cable rates, loss of subscribers, and therefore fewer people hearing Comcast's speech. (*Id.* at 38:5–12.)

Comcast has articulated how the line extension requirements might burden Comcast's speech—that is, by diverting funds from content acquisition and by potentially causing a loss of subscribers. But those circumstances do not force Comcast to alter its messages any more than the must-carry provisions in *Turner I* forced the cable operators to alter theirs. The cable operators in *Turner I* might have preferred to carry other (potentially more popular or more profitable) networks instead of the local broadcast stations required by the must-carry provision. But that was not a sufficient burden on speech to trigger strict scrutiny.

Comcast cites no authorities suggesting that strict scrutiny applies simply because regulations require cable operators to spend money differently than the operator might choose if it were unregulated. Indeed, at oral argument Comcast conceded that strict scrutiny is not triggered just because a regulation requires a cable operator to spend money on something other than content acquisition. (*See* Doc. 55 at 38–39.) Rather, Comcast's concern is that the line extension requirements are unique to Comcast. The court accordingly turns to Comcast's argument that Condition 33 "singles out" Comcast for disfavored treatment.

### 3.   "Singling Out"

Again with reference to *Turner I*, the court considers Comcast's argument that strict scrutiny should apply because the VPUC has applied Condition 33 to Comcast but has not burdened any other Vermont cable operator with such a requirement. Quoting *Turner I*'s discussion of whether the must-carry rules imposed burdens based on speech content, the Second

Circuit has reiterated that "[s]o long as they are not a subtle means of exercising a content preference, speaker distinctions . . . are not presumed invalid under the First Amendment." *Time Warner*, 729 F.3d at 159 (alterations in original) (quoting *Turner I*, 512 U.S. at 645). Is it plausible that Condition 33—which is allegedly unique to Comcast's franchise renewal—is a subtle means of exercising a content preference? Or, in the words of *Turner I*, does it pose the "dangers of suppression and manipulation" that were present in *Minneapolis Star*? *Turner I*, 512 U.S. at 661.

Even giving Comcast the benefit of all reasonable doubts and inferences, the court concludes that Comcast has failed to plausibly allege that the line extension conditions are a means of exercising a content preference or that they pose a danger of suppression or manipulation. The Supreme Court in *Turner I* distinguished *Minneapolis Star* because of the special characteristics of the cable medium as compared to other media, and because the must-carry obligations apply to almost all cable systems, rather than a select few. *Turner I*, 512 U.S. at 661. Admittedly, neither of those two bases for distinguishing *Minneapolis Star* is present in this case: according to the Amended Complaint, the line extension requirements apply only to Comcast, and other competing Vermont cable providers—competitors in the same medium—face no similar requirements.

But *Minneapolis Star* is distinguishable from this case for a different reason. *Minneapolis Star* involved a tax on newspapers, the entire content of which is protected by the First Amendment. *Arsberry v. Illinois*, 244 F.3d 558, 564 (7th Cir. 2001). Here, Condition 33 is not a tax—it is a condition imposed as part of the grant of a franchise. And Comcast is not a newspaper. *See City of Los Angeles v. Preferred Commc'ns, Inc.*, 476 U.S. 488, 496 (1986) (Blackmun, J., concurring) (observing that "[d]ifferent communications media are treated

36

differently for First Amendment purposes").  Although telecommunications infrastructure such as cable may be used relatively commonly for First Amendment purposes, "the federal courts do not use that fact as an excuse for bringing the taxation and regulation of telecommunications under comprehensive judicial surveillance in the name of free speech." *Arsberry*, 244 F.3d at 565.  The court does not read *Minneapolis Star* as holding that strict scrutiny applies to any law that "targets only a few incumbents," and accordingly respectfully declines to follow *Time Warner Cable, Inc. v. Hudson*, 667 F.3d 630, 638 (5th Cir. 2012), to the extent that it so holds.

Here, the line extension requirements do not on their face favor or disfavor any particular message or view; they are entirely content-neutral.  To the extent that they can be seen as disfavoring Comcast relative to other Vermont cable operators, the court follows the Second Circuit's decision in *Time Warner* and concludes that the "pertinent question for determining the appropriate level of scrutiny is whether that preference is 'based on the content of programming each group offers.'"  *Time Warner*, 729 F.3d at 159 (quoting *Turner I*, 512 U.S. at 658–59).  In this case, Comcast does not allege—and the court can find no reasonable basis to infer—that the line extension requirements imposed on Comcast are based on the content of programming offered by Comcast as compared to Comcast's cable competitors.  The court accordingly applies intermediate scrutiny.

### D.    Comcast Does Not State a Plausible First Amendment Claim

A burden on speech will be sustained under intermediate scrutiny if it "(1) 'advances important governmental interests unrelated to the suppression of free speech' and (2) 'does not burden substantially more speech than necessary to further those interests.'"  *Time Warner*, 729 F.3d at 160 (quoting *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 189 (1997) (*Turner II*)).

37

The court examines the Amended Complaint to determine whether Comcast has plausibly alleged a violation of its First Amendment rights under intermediate scrutiny.

### 1.   Important State Interest Unrelated to Suppression of Free Speech

In its Renewal Order, the VPUC found that line extension conditions were justified by the "needs and interests of the state for additional line extensions to increase the availability of service in rural and other unserved areas of the state." (Doc. 1-2 at 89.) Quoting one of its prior decisions, the VPUC stated:

> In granting certificates of public good to cable companies, one of the major goals of this Board is to ensure service to as many customers as possible. Many Vermont residents find cable services to be valuable, but if service is limited to a few densely populated areas, Vermonters outside of those areas fail to benefit. Thus, inherent in the principle of the public good is an obligation to make service available to as many customers as possible within a company's service territory. The Board embodied this principle in Rule 8.214(B), which requires that in reviewing certification petitions we consider maximizing service availability.

(*Id.*) The Cable Act itself indicates that its purposes include establishing franchise procedures and standards "which encourage the growth and development of cable systems." 47 U.S.C. § 521(2).[19]

---

[19] Defendants refer to portions of Vermont statutory law in support of their contention that the line extension requirements advance important state interests. The Vermont act to which Defendants refer—"Establishing the Vermont Telecommunications Authority to Advance Broadband and Wireless Communications Infrastructure Throughout the State"—primarily references broadband services, but Defendants say that it also recognizes the role of cable system line extensions to expand broadband infrastructure. (Doc. 22 at 16–17.) Comcast asserts that extending broadband infrastructure is "not a legally relevant consideration." (Doc. 38 at 28 n.15.) Defendants maintain that broadband is "cable-related" and that "government interests under the First Amendment are not confined by the Cable Act." (Doc. 43 at 11.) In its sur-reply, Comcast insists that the Cable Act expressly prohibits a franchising authority from imposing broadband conditions in a cable franchise renewal. (Doc. 48 at 2.) The court avoids these potential issues by confining its analysis to Vermont's interest in expanding cable television services.

Comcast does not dispute that Vermont has an important interest in extending cable television services to uncabled areas of the state. Nor is there any plausible cause to suggest that expanding access to cable television is an interest related to the suppression of free speech.[20] Instead, Comcast argues that the line extension provisions do not serve Vermont's interest in expanding access to cable. (Doc. 38 at 26.) Comcast returns to its argument—relying on *Minneapolis Star* and on the Fifth Circuit's decision in *Hudson*—that the VPUC is discriminating solely against Comcast to meet the asserted interest. (*Id.* at 27–29.) But for the reasons stated above, *Minneapolis Star* is distinguishable, and the court declines to follow *Hudson* insofar as that case applied strict scrutiny. Comcast's arguments are really directed at the second prong of intermediate scrutiny analysis. The court turns to that prong next.

## 2.     Tailoring

As described above, Comcast has articulated how the line extension requirements might burden Comcast's speech—that is, by diverting funds from content acquisition and by potentially causing a loss of subscribers. Of course, even Vermont's statewide policy on expansions of cable television lines under Rule 8.313 also imposes similar burdens on all Vermont cable operators. Rule 8.313 imposes costs incurred in expanding the availability of cable service on all cable operators. Comcast does not challenge Rule 8.313, and in fact advocated for its application in the Renewal Proposal. Comcast's position is that the VPUC has unjustifiably imposed substantially greater burdens on Comcast's speech than on other cable operators serving Vermont.

---

[20] Comcast argues that compliance with the cable expansion requirements will divert funds from Comcast's content acquisition and will cause a net loss in Comcast subscribers. The requirements may incidentally burden Comcast's speech, but expanding access to cable is not itself an interest that is related to suppression of free speech. To the contrary, expanding access to cable would seem to promote rather than suppress free speech.

The court concludes that—even crediting Comcast's allegations that the line extension requirements impose greater burdens on Comcast's speech than on other cable operators—none of Comcast's allegations plausibly suggest that the burdens are substantially greater than necessary to further Vermont's important interests.  Comcast argues that the line extension requirements are underinclusive because other cable operators are omitted.  (Doc. 29 ¶ 99.)  But Comcast's alternative solution—to require Comcast to do no more than abide by Rule 8.313— would be only "marginally less intrusive" on Comcast's First Amendment interests.  *Turner II*, 520 U.S. at 217–18.  That is insufficient to invalidate the line extension requirements under intermediate scrutiny.

Notably, Comcast does not allege that the line extension requirements will prevent Comcast from operating profitably.  Nor does Comcast have a First Amendment right "to speak profitably."  *AMSAT Cable Ltd. v. Cablevision of Conn. Ltd. P'Ship*, 6 F.3d 867, 871 (2d Cir. 1993).  For additional perspective on the level of intrusion, the court refers to the VPUC's Renewal Order.  Comcast challenged the VPUC's consideration of the impact of Condition 33 on profitability, but on that topic the VPUC found that the condition would not impair Comcast's ability to provide service or to continue to earn a fair and reasonable return on its investments.  It might have been less intrusive or costly for the VPUC to require Comcast to do no more than to follow Rule 8.313.  But that does not mean that the line extension requirements are insufficiently tailored to satisfy intermediate scrutiny.

Comcast also argues that the line extension requirements are overinclusive because they prohibit Comcast from counting towards its 550-mile mandate any line extensions that are funded by state or federal grants.  (Doc. 29 ¶ 94.)  In Comcast's view, the state's interest in completing 550 additional miles of cable are satisfied regardless of whether Comcast pays for it

or whether some other entity does. Vermont's interest, however, is broader than just the addition of some specified number of miles of cable. The interest is to maximize access to cable. Excluding miles funded by state or local grants advances that broader interest.

For all of the above reasons, the court concludes that Comcast has failed to plausibly allege that the line extension requirements burden substantially more speech than necessary to further Vermont's interests. Because Comcast's allegations do not plausibly suggest that the line extension requirements fail intermediate scrutiny, the court will dismiss Comcast's First Amendment claim.

## Conclusion

Defendants' Motion for Partial Dismissal of Plaintiff's Complaint (Doc. 22) and Defendants' Motion for Partial Dismissal of Plaintiff's Amended Complaint (Doc. 32) are GRANTED IN PART and DENIED IN PART. The motions to dismiss are denied insofar as they seek dismissal of the claims in Counts 4–6 and the portions of Counts 8–9 that are based on the Vermont Constitution. The motions are granted insofar as they seek dismissal of the First Amendment claim in Count 8.

Dated at Rutland, in the District of Vermont, this 19 day of September, 2018.

_____
Geoffrey W. Crawford, Chief Judge
United States District Court

41